Case numbers 24-3133, 24-3206, 24-3252, Ohio Telecom Association et al versus Federal Communications Commission et al. Oral argument not to exceed 15 minutes per side. Roman Martinez for the appellant. You may proceed. Good morning. Good morning, Your Honors. May it please the court. Roman Martinez for the petitioners. I'd like to reserve three minutes for rebuttal. Very well. Your Honors, the FCC exceeded its authority earlier this year when it reenacted virtually the same data breach reporting rule that Congress had vetoed in 2017. Virtually the same or substantially the same? I think it's substantially the same. I think that's the phrase that we have to apply, right? Right. Substantially the same is the phrase that you have to apply. I think substantially the same sort of indicates that it doesn't have to be perfectly the same. And here, the new rule was the same in all the respects that matter the most. If you look at the chair's statement when the rule was announced, all the key features of the rule that she emphasized and everything that she said the rule was doing were things that the 2016 rule had done. Most importantly and most fundamentally, the expansion of the rule to cover not just CP&I, which had been covered under the 2007 regulation, but also PII. And we think there were two problems with this. Number one, it exceeded the agency's authority under the Communications Act. And number two, as Your Honor was just alluding to, we think it violated the Congressional Review Act. I'd like to start wherever the panel would like me to start, but perhaps I'll start with statute. And I think the relevant statutory provision here is section 222, because that's the statute that specifically covers the privacy of customer information. And section 222 has been interpreted for many years, not just by us, but also by the agency itself as setting forth a general principle in 222A, but then elaborating on and specifying how that principle applies with respect to customer proprietary information in section 222C. And the detail in section 222C, the specific rules governing the non-disclosure and when disclosure is mandatory, when the customer requests it, all of that detail I think shows that 222C is supposed to cover the field of customer proprietary information. And there isn't some sort of much broader residual authority in 222A. And that's of course how the agency... Is your position that customer proprietary network information is the same thing as the proprietary information that's mentioned in 222A? As to customers, yes. We think that those are the same. And I think that's not just our position, but that had been the longstanding position of the agency. And I would just point the court to the 2013 declaratory ruling where, and I'm quoting here, only that information that meets the definition of CP&I is subject to section 222. I mean, but at this point we can't rely on sort of their interpretation, right? So we're just looking at it anew, looking at the statute anew. How do we look at this and see that these are the same thing? So I think certainly you can't defer to their current interpretation, but the Supreme Court in the Loper-Bright case said that you should take account of their longstanding and contemporaneous interpretation. And for many years, their interpretation was our interpretation as we laid out in our brief. But even leaving the FCC's sort of flip-flop and the history aside, we think that we have the best interpretation of section 222. I think, let me point to a couple of things. First of all, we just think structurally, if you look at the relationship between 222A and 222C, we think the best reading, if you only had those two provisions, is that 222C sort of elaborates and explains how the general principle in 222A applies. Even if you thought that was ambiguous or maybe there were other possible ways to read that, I think there are three reasons outside of just the relationship between A and C for why we have the better understanding. Perhaps most tellingly, if you at other provisions of section 222, and in particular 222D and 222E and G, all three of those additional aspects of section 222 only make sense if 222C covers the entire field of customer proprietary information. So 222D is maybe the best example. That creates an exception to the bar on disclosing CP&I, and it reflects the fact that Congress wanted to allow, in certain limited circumstances, telecom carriers to disclose CP&I, for example, to law enforcement personnel or to emergency responders. And so textually, they created an exception, and the exception by its terms only applies to CP&I. And so the other side's theory, the FCC's theory, is that 222A actually is much broader and bars disclosure of PII that doesn't count as CP&I. But the problem is the statute doesn't create the same exception that would allow the carriers to disclose PII. But why would that make any sense? If Congress wants carriers to tell law enforcement or tell emergency responders about the CP&I, why wouldn't it also want to tell responders about the PII? Now the FCC comes and they say, oh, no, no, we've got a solution to that problem. They do this on page 43 to 44 of their brief. We're just going to pretend that the exception applies to 222A as well. So in order to make their theory of the statute work, they actually have to essentially rewrite the statute and take an exception, which on its face only applies to 222C and to CP&I, and to apply it to their extremely broad view of 222A. I would just admit that doesn't make any sense. I have a background question. It seems to me that, you know, in your briefs, you look to support the past FCC orders and interpreting section 222 as allowing them to regulate certain categories of data. But what evidence do you have to suggest that the FCC thought they were regulating to the full extent of their statutory authority in past rulings? So I think the best example is the 2013 order. Let me quote from a different portion of the order. Here's the exact language. It's on page 24 of the 2013 order. If the information a carrier collects in the future does not meet the statutory definition, and this I'm not quoting, of CP&I, but that's what they were referring to, the definition of CP&I, then section 222 will not apply. So I think what they're saying is that to the extent that we're if it doesn't count as CP&I, section 222 does not apply. In other words, we have no additional authority. Isn't that prior to the interpretation of PII? It sounds to me like what you're doing is locking in the earlier interpretations that are in some orders. And I know what you have is you have two sides. You have an order where the FCC says this, and the FCC has an order where they said it differently. So the question is, is this, is your position that this is completely outside their authority? I'm sorry to interrupt, but it just seems to me that that presumes that what they did in the past was the full extent of their capacity. And I'm not seeing evidence that really supports that other than dueling quotations from previous orders. I don't think there are dueling quotations. I think all the quotations up till 2014 support us. So the contemporaneous and consistent interpretation for almost 20 years supports us. Well, the consistent interpretation was for 20 years when you didn't have the problem you have now. There is no question that practically speaking, there have been more and more and more significant data breaches over time and that they have become like a rolling ball that is a true danger to consumers. So why are you saying that they are not able to adapt their congressionally authorized authority to in fact address the changing nature of telecommunications and their harm to consumers? So the PII problem didn't just exist starting a few years ago. If you actually look at what Congress did in other provisions of the Communications Act, I'd point the court to Section 551. There's a provision of the Communications Act that was enacted in 1984 where Congress expressly wanted to protect subscriber PII. So they knew about the problem then, they did it then. They also did it in Section 338I of the Communications Act. That was a statute that was passed in 2004. Again, long before they switched their interpretation of Section 222. That provision talks about satellite operators and their requirements to protect subscriber PII. So Congress was definitely aware of the PII problem earlier. I think the other, in addition to the fact that that problem existed, you have the fact that consistently for 20 years, they interpreted Section 222 as being co-extensive with their ability to regulate CP&I. They weren't just saying we can regulate CP&I and there may be other things. They said if it doesn't count as CP&I, it doesn't fall under 222. Now that's not binding on you, but I think that's persuasive under Loeb or Bright. That's persuasive evidence and you should give it weight when we're looking at what the statute means. And then in addition to that, even if you didn't have that history, we have the best interpretation of the statute just on the text. We have the relationship between A and C. Why does C provide so much detail about CP&I and just be completely silent about PII? I think the reason is Congress thought it was addressing the problem of customer privacy information with the details it gave about C. You also have the other provisions that I mentioned earlier, which make no sense if Congress also thought that the statute regulated PII. Why would you create an exception to allow carriers to give emergency responders CP&I but not have that exception to allow carriers to give first responders PII if PII was in fact covered? The reality is PII wasn't covered. I see my time is running down. I'd love to talk about the Congressional Review Act issue because we do think we have the best view of the statute here, but regardless of that, we just don't... I guess before you move on, can you also talk about 201? Yeah. That's the practice section and they also rely on that as authority. They do now. They do now, Your Honor. In the order, you know, they spent the vast majority of their analysis on 222. It's kind of pivoted here. They switched gears. Yeah, they switched gears, which I think is a signal of the weakness of their 222 argument. We think their 201B argument is also weak, two general reasons. Number one, 201B needs to be read in light of 222 and if 222 sort of comprehensively regulates, as we think it does, the privacy of customer information, which is the heading of 222, then they can't just use 201B's sort of very general language to undermine that. Can you sort of elaborate on that? I mean, 201B's been there since 1934, so, you know, I think there's a canon out there that says whatever those words mean, we look at it at the time it's enacted. So, what those practices mean in 1934 and then, you know, years later, we get 222, but doesn't practices already have whatever its meaning is at that time or does that definition change in light of, I think, the Telecommunications Act of 1996? So, two points on that, Your Honor. I think the actual canon that, yeah, you look at statutes what they mean at the time of enactment, but in a circumstance where you have a general statute and then a more specific statute later, you actually harmonize. And I would point the Court to a case that we didn't cite in our brief, but I'll just give you the citation of Supreme Court case, United States v. State of Romani. It's at 523 U.S. at 530 to 531. It says that a specific policy embodied in a later federal statute should control our construction of the earlier statute, even though the earlier statute hasn't been expressly amended. But not necessarily silently superseding, right? I mean, your argument is effectively a silent superseding of 201B. No, my second point was going to be that 201B wouldn't have covered this even without 222, so I want to get to that. But we don't think it was silent. We think in the header of 222, here's where we're going to deal with the privacy of customer information. So there wasn't anything silent about that. Congress told the world that this was going to be this new provision that was going to deal with this topic. It would be very odd to say, okay, well, this is the new provision that deals with the topic, but we're going to allow an earlier provision that's much more general to essentially let the agency do a bunch of things that they wouldn't have been allowed to do under the new statute. I think what troubles me, one of the things that the FCC notes is that if this interpretation of 201 prevails, then telecommunications would be the only major industry not subject to reporting requirements for data breaches. Oh, no, that's not right, Your Honor. Yeah, I was going to ask you, why do you think that's correct or incorrect? So a couple reasons. First of all, I think it's undisputed on all sides that the telecommunications industry is subject to very extensive regulation in this field by the states. So there are 50 states that have passed. I understand that. I think you are absolutely correct that the states can pass that. But the question is whether there is an overarching capacity of the Federal Communications Commission, the federal entity in charge, as to whether it can actually have a consistent oversight of this growing problem. And so I'm not comforted by the idea that each state can do it on their own and we can have a patchwork nation as to what, particularly in light of the fact that technology is international. Right. So a couple of things. First of all, it's not that there's a void. You have the states. Secondly, even as to telecom carriers, to the extent that, for example, the FTC is not able to regulate in this area, it's only to the extent that the telecom carriers qualify as common carriers. And that's a thorny question. I know Judge Griffin is considering that question. I think it's a little bit unclear. So I don't think it's right to necessarily say that the FTC has no power here whatsoever. There's certainly some aspects of what telecommunications carriers do that might be outside the scope of the FTC Act's prohibition on regulation. But more importantly, I don't think it's right to think of, to think of, you know, to start to analyze the statute with the presumption that the agency has to have the power. Instead, the way to start is to ask the question of whether Congress has given the agency the power. And to answer that question, we have to look to what the law says, of course. And here, you have 220- We have to look to the purposes stated for the existence of that commission, right? Right. But the purposes of the, for the existence of the FCC have never been to regulate privacy or to require notifications of data breaches. And that's why I think even 201-B on its own wouldn't actually cover this. And maybe I'll just quickly, but I do want to pivot to the congressional- I wanted to ask you, does 201-B even apply? Yeah, 201-B does not apply. I didn't think so. No. And I think if you look closely at 201-B, there are at least four features of it that suggest that it does not cover notification of data breaches at all. The header, the nouns, the limiting prepositional phrase, and the adjectives. The header says set service and charges. It's not talking about notifications. It's not talking about data breaches. The nouns, the word practice, which is the word that they hang their hat on, is embedded in a list of terms, charges, practices, classifications, and regulations. And the Notice to Our Associates canon tells us that practices needs to be interpreted in light of those surrounding nouns, all of which have to do with rates and the terms and conditions of service. The Global Crossing case emphasizes this too from the Supreme Court, which said that 201-B's traditional historic subject matter is rate setting and rate division. There's also a limiting prepositional phrase. The statute says the practice has to be, quote, in connection with a communications service. And I think that that has to be read to be a pretty direct connection, just like the Supreme Court read very similar language in the Federal Power Act in the FERC case, just as the D.C. Circuit read that same language in the California ISO case. So there needs to be a direct connection between the practice and the telecommunication service. When you have a data breach, a failure to notify a customer about a data breach, that's not directly connected to the telecommunication service unless everything the carrier does is related to a telecommunication service. That's not enough. Let's move on to the Congressional Review Act, which is going to impact a lot of other cases. Issues in this case are very important, but I think the CRA issue has the potential of impacting a lot of other cases. Their argument is that even if the 2024 rule is substantially similar to the 2016 rule, nevertheless, the FCC can promulgate it because Congress disapproved of a package of rules, whether there are three or four rules that were lumped together, and that the FCC can get around the disapproval by promulgating them on a single basis or have promulgate two of them at a time and then another one. That way, there's no violation of the CAR because guess what? FCC can get around it and implement the rules anyway. What's wrong with that argument? Your Honor, it is a recipe for circumvention of the statute. I think you described it exactly right. Their theory is that you could take a regulation that is vetoed, it's got parts A, B, and C, and you could just split it up. The reissuance bar says you can't do A, B, and C again. They say that's what the Act allows and that's what Congress intended. Why is that not consistent with the Congressional intent? Because the obvious intent here was to actually put a meaningful limit on the agency action. It's not a meaningful limit if the agency can just circumvent it by taking a big regulation that didn't go through, chopping it in half, and then passing both halves separately. They say, oh, presto, these are two different regulations. This is a recipe for circumvention, not only in that way, but then they have another strategy for circumvention. They say, as long as you add one new little thing, however small it is, then the new rule is different from the old rule, therefore it's not substantially the same in their view. They have sort of two strategies. One is you can split it in half and pass it and get around the reissuance bar that way. Second, you can take a rule and just add something to it, and then it becomes substantially different, and then that way the reissuance bar doesn't apply. Aren't we operating between two large extremes? Whether the CRA's ruling completely destroys everything that was within that old rule, and anything that could be considered a part of it is just gone. That's your side. The other side is how dissimilar does it have to be, and isn't it incumbent on us to make that determination on the line between those two? Because there is some point on that line at which it is not substantially the same or substantively identical. Because we know your response is, well, then they can just ignore it, but they can't. If they want to promulgate any rule, they have to follow all of their requirements in promulgating a new rule, and people have a chance to comment. It has to be considered, and you have to meet those requirements. So, tell me why your argument falling into the, once the Congress says you can't do this, then everything that's in that body is no longer a possibility. My simplistic answer, but I think it's the right answer, is because Congress said so. Congress wanted to give an unusual, a new tool, because it was concerned about congressional intent being subverted by agencies, and it wanted to put a meaningful limit on agencies. It said if they pass a rule, and if Congress goes through the extraordinary step, it's happened only 20 times in the 30 years or so since the CRA was enacted, only 20 vetoes have happened. If Congress takes the extraordinary step of vetoing the rule, the agency cannot just reenact it, and they can't get around that by slicing and dicing. The remedy is for Congress to pass a statute, is it not? Let Congress do their job rather than the administrative agency. That's exactly right, Judge Griffin. The argument is, well, there's no remedy at all, then, that all these things that were promulgated are out forever. Well, they probably are out forever for the administrative agency, but if Congress thinks it's a good policy, which actually may be a good policy for telecommunication carriers to report data processing or personal information data of their customers, that may be a real good policy, but it's up to the Congress now rather than the agency. Is that the answer? I think that's one of the answers, but I have another answer, an additional answer, which hopefully can allay some of the concerns Judge Stranch has. So, first of all, Congress can absolutely act and can authorize the agency to act. I think the second possible solution, though, to the concern you raise is to accept a portion of the FCC's theory here of how this works. The FCC has explained that, in their view, the Congressional Review Act allows Congress to essentially line-item veto a regulation. It doesn't have to go up or down, but I think if you're concerned about the problem, Judge Stranch, I think what you can do is kind of compromise between our view and the FCC's view. I think what you should say is that if Congress vetoes the rule as a whole, then all of the individual sub-rules are also vetoed and none of those individual sub-rules can be reissued. But Congress might have the option of not vetoing the rule as a whole, and if they like something that's in the rule, they can just avoid vetoing it by specifying in their veto which portions of the rule are being vetoed. That's what the FCC proposes in their brief, and I think if that's the correct interpretation of the CRA, then I think you have a solution to the problem, a global solution to the problem, because what it does is essentially... The question is whether, in the end, how it impacts the agency that is involved, right? Because if there is a disagreement, perhaps, shall we say, a political disagreement on the viability or the importance of a commission, then the CRA becomes a cudgel. They can absolutely knock out everything and protect it for all eternity. Right, and I think that we have to recognize Congress has the ultimate authority here. The policy of the CRA is to restore Congress's authority, and I think my solution, which is, again, to say if Congress vetoes everything, none of the individual sub-rules can go into effect, but Congress might be able to choose which aspects of the rule it vetoes. Well, that's a good concept. I think that's helpful, but here I'm looking at the distinction here between the 2016 rule and the 2024 rule, and there's some pretty big distinctions, particularly in the intentionality. You know, you look back at the 2016 and the 2024, I think the kind of background on data breaches is very different in this particular 2024, and intentionally different from 2016. Just, you know, a simple example is that the legislative history. The primary concern in 2016 was regulating broadband internet service. They were duplicating services with the Federal Trade Commission. I mean, one of the sponsors even said having two privacy cops on the beat creates confusion and harms customers. Isn't that a different intentionality than what we are talking about, a rule addressing what has now become a telecommunications nightmare of data breaches? So, I don't think that the, and I don't think the FCC would actually say that this is their view if you asked them, you may want to ask them, but I don't think it would be the right way to think about the CRAs that in order to figure out, you know, how broad or how narrow the reissuance bar is, we have to like look at the legislative history of the disapproval, the resolution of disapproval. I think that that way lies madness, especially in this world of, you know, a more textually faithful interpretation of statutes. It would be very odd to say that the only way you can actually have an effect in Congress is not by enacting your intent in law, but rather by making a floor speech or getting some staffer to insert some paragraph into a committee report. I just don't think that's the right way to do it. So, what is the right way? Because what you've got is, you're saying, your answer is, it's swept off the map and done forever. And I'm looking at those two provisions and I'm not seeing substantial identity. You know, let me just give you a little list and you tell me why this doesn't make a distinction. The notice duties are significantly different. 2016 required even more. The key term breach is defined somewhat differently. I know you have an answer for that, but it is in fact different definitionally. The 2016 covered 5,000 plus customers. The 2024 covers only 500. It's bringing it down to the level of the consumer who is in trouble when their personally identifying information is made, is taken and used against them. Can I respond to those, Judge Trench? So, what I would say on that is, I think you pointed to a couple of differences. We do not think they are major. And I think that the reason we don't think they're major is in light of what the rule is actually doing and what the FCC itself said the rule was doing, why the rule was significant. None of the things that you mentioned are on that list. So, I think the fundamental changes from the 2007 regime that the agency tried to enact in 2016 and then tried to reenact this year. Number one, most fundamentally, small regulation of CP&I becomes big regulation of PII. Sweeping expansion. Number two, inadvertent breaches are now covered. Number three, the FCC has to be notified, not just other... There's a good faith rule. That's right, but Chair Rosenworcel did not even mention the good faith rule as part of, you know, when she issued her statement. She summarized all the things, she emphasized all the things that we are emphasizing when she was explaining why this rule was important. The good faith rule wasn't on the list. The other items you mentioned were not on the list. So, yes, it's true. The good faith rule is a little bit different. We don't think that's material or enough to detract from the substantial, you know, similarity of the rules. Is the key, whether it's substantially similar. It doesn't have to be identical. It doesn't have to be identical. And I think even if you thought that the good faith rule was an important difference, even if you thought that, I think you would still have to conclude that the rule is precluded to the extent that it does all the other things. Okay, so maybe even if good faith is new and it's different, that may not be precluded, arguably. We think it still is. But even if you thought that, the expansion to PII would still be precluded. The inadvertent breach would still be precluded. The FCC notification requirement, the 30-day requirement, the harm-based trigger, all of the things that Chairman Rosenworcel emphasized when she announced this rule, those are the fundamental aspects of the rule. Those are still subject to the reissuance bar, and the rule has to fall because of that. Okay, we're way over time here, and you still have rebuttal. But are there other questions right now? I mean, Mr. Martinez will be back here in rebuttal. But all right, let's hear from the FCC. Good morning. Good morning, Your Honor. May it please the Court. Adam Sorensen for the government. Faced with an alarming rise in data breaches affecting telecommunication customers, most sensitive information, the commission in the challenge order modified its breach notification rules to cover personally identifiable information such as social security numbers and unique biometric data. That change is well-grounded in the Communications Act, and it is fully consistent with the commission's obligations under the Congressional Review Act. Petitioners paint a picture of a highly restricted statutory scheme under which the commission's hands are tied from responding to meaningful changes in the privacy landscape. But I think that notion is belied by both the plain text of Sections 201B and 222A, and also the broader statutory context under which those provisions were enacted. Which statute gives you the stronger basis for the authority for this particular rule, 201B or 222? So the commission relied on both provisions. I think they're both strong bases for this rule. Obviously, they're a little bit different. 201B is a broader provision. 222 is more specifically directed to privacy. So I think a narrower view of this authority would come under 222, but I think it's amply supported by both. Just to address 222 first, since that's where petitioners started, I don't think that there is the kind of interpretation in the regulatory history that they have characterized that the commission is taking. From the very beginning, the commission has recognized that 222 covers both CP&I and other kinds of customer information. And I don't think we need to get too much into the dueling quotations that you pull out of individual orders. I think the broader picture makes clear that petitioners have identified nowhere where the commission ever said that its authority was limited only to CP&I. It recognized time and again that it did have authority to enact rules that were relevant to CP&I, but it nowhere said that it was that that sort of that narrow provision in 222C occupied the entire field of the commission's regulatory power over privacy. I think, Judge Stranch, you got right to the heart of the matter in that the commission, like other agencies, when it's granted regulatory power over an industry, will often proceed incrementally in enacting different kinds of rules as it responds to problems. What's your definition of proprietary information? I'm not saying CP&I, but just proprietary information as that term is used under section 222. Sure. So I think proprietary information in section 222 is best read as referring to relating to a proprietor or a business. And specifically in this context, it means the information that is obtained through that business service relationship. And indeed, I think that's exactly what Congress said in 222H1 when it was defining the more specific term consumer proprietary network information. Part of that definition states that it has to be information obtained in the course of the customer carrier relationship. So I think in 222A, without that limitation of network where it's talking about a broader category of consumer proprietary information, the best reading is that it's talking about information obtained by carriers through the relationship. On this topic of this important difference between and the rest of the statute, I think it's relevant to note that Congress knew exactly how to talk about consumer proprietary network information when it wanted to and did so in some detail in 222C. But 222A has to have some independent meaning. And I think its variation in wording is significant because it did not use the word network. It was talking about proprietary information of and relating to customers as well as other carriers and equipment manufacturers. So normally when Congress is drafting a statute and just sort of announcing general principles, it might say purpose or it might say preamble. But here, the statute is structured very differently. The 222A says in general, telecommunications carriers have this duty to protect the confidentiality of information. I think that language can't be read as limited only to consumer protection network information addressed in subsection C. And to respond to my friend's comments on the exceptions laid out in D&E, I don't think it's inconsistent with the commission's reading of the statute to the way those exceptions are drafted. And that's partially because subsection A is drafted as imposing a general duty on carriers, whereas C is more of a and as well as B is more of a shall not. It actually says shall only disclose in certain circumstances. But I think B and C are specific restrictions, whereas A is generally imposing an affirmative duty. So it wouldn't really make a lot of sense for the very specific exceptions in D&E to say that they applied to A. And all the sort of anomalies that petitioners say are created by the commission's reading of the statute really aren't created. It's only created by their insistence that the exceptions in D&E can't apply to whatever rules would accompany the general duty described in A. I'd like to briefly address 201B as well, Your Honors. I think, you know, my friend identified the general global crossing case in the Supreme Court case interpreting this provision. And I do think it's helpful to start there because the Supreme Court noted in that decision that the term practices in this statute can refer to things like deceptive marketing and contracts with commercial building owners. And, you know, I think that shows that the Supreme Court had a more flexible and capacious understanding of this statutory provision, which it fits well with the commission's understanding and does not at all fit with petitioners' reading of 201B as a sort of only a rate-setting provision. You know, I think even if you take a narrower view of 201B and read the language about in connection with a communications service to mean that the practices are really limited to those things that are inherent to telecommunications services, I do think that still gets you to the same place. And that's because the collection and handling and retention of data, that's really what data breach regulations are about. But reporting data breaches, is that included? I mean, that's something different, isn't it? So I think the reporting is the tool, the reporting requirements are the tool that agencies use to address problems in the practices of handling data. And really, it's the lightest touch regulation that there is. And certainly, I don't think that petitioners would say that the 201B gives us authority to... It's a new duty, isn't it? Reporting breaches as opposed to the practices of the communications? So I think, you know, 201B itself gives the commission authority to enact rules and regulations implementing that provision. And there are also other similar rulemaking provisions in the Communications Act. So I think it's best understood as if a practice is unreasonable and unjust under 201B. I mean, you're imposing a new legal duty. That's all, as opposed to existing practices and what's going on before. And I think there's a difference there. Well, respectfully, Honor, I would disagree. And I think that the key to understand this is that if a practice is unreasonable or unjust, it is declared unlawful under 201B. And then the commission has to grapple with that. And it can use its rulemaking powers, in this case, to impose a reporting duty to address that problem. I also think it might be helpful to step back and understand the context in which 201B was enacted and also Section 222. And Judge Stranch touched on this earlier. Congress understood, when it enacted these statutes, that telecommunications carriers are categorically exempt from oversight by the FTC. And so I think you have to read that unjust and unreasonable language as Congress was trying to give complementary powers to the commission to regulate telecommunications carriers in a similar manner to the way that the FTC regulates other major industries. I don't know about that. I think Congress can give different powers to different agencies. And to say that Congress intends to give them all the same powers, I'm not sure. Well, I don't think it's the same power. But I also think that if you accept petitioners' reading of the statutes, both 201B and 222, it would mean that federal authorities are completely ceding the field in the regulation of disclosure of personally identified... Congress has done stranger things, that's all. And then if they do something wrong, it's their prerogative to enact a law. That's all. I mean, you know, we've seen Congress do things kind of strange before. Well, I also think that the plain text of the statute suggests that Congress was intended to confer fairly broad authority to the commission in this area. Do you see the fulfillment of the duty of the FCC to address new concerns and challenges over time such that their regulatory nature develops in response to the authority they have been given to govern communications? Yes, I think that's correct. And I think that's always been Congress's understanding of the kind of authority that it's given to the commission to respond to problems as they arise. And we have to act within the authority that Congress has given us. But again, I think that authority is flexible and intended to respond to problems as they arise. My concern is the argument that your authority is bound by the historical precedent that you began to work with. The idea that if we don't have the problem at the earliest iteration of the authority to the FCC, then we cannot claim that the language that gives a general duty to this organization, this commission, to take care of customers and consumers, that it cannot adapt to the time. Explain to me, that's as much a feeling as a concept, explain to me why it is correct to see the law that way as opposed to how your opposing counsel understands it, which is very much tied to the initial exercise under the powers given. Sure. So I think that's the correct way to read it because it comports with the plain language of the statute and the original purposes of setting up the communications commission to oversee a new and important industry, recognizing that in particular with an agency that oversees technology that is fast changing, that flexibility is important in the rules that it implements. And I think you see that in the development of the law. So the commission was regulating proprietary information before the 1996 Act, under its original powers under the 1934 Act. And when the 1996 Act came along, the Congress was largely concerned with adapting its laws to new competition in local markets. And with a statute like 222, I think you see that in that subsection A restates the general duty that it wanted to impose on telecommunications carriers. And I think conferred quite a good deal of discretion on the agency to make the rules that enforce that duty. It also included more specific requirements that it really wanted to set a floor for with the CPNI requirements in subsection C. But I don't think it changes the background principle that Congress was not intending to cut off the agency's authority to do work in the privacy area, which it had been doing before the 1996 Act, simply by setting a floor on specific CPNI information in 222C. And you would expect if further development occurs in this really troubling data breach world that the FCC would be authorized to continue to address the particular technology developments that are harming consumers? Yes, absolutely. And I think that's what's happening here. I think in 2007, the commission responded to a rise in pretexting scams and changed its rules then, enacted new breach notification rules in 2007. And I think you see that again in the newest rule, where it's really responding as conditions have changed on the ground. And if you look at the order, it explains that these new rules really are in response to a very troubling rise in the incidence of these sorts of data breaches and the ability of bad actors to collect and collate data, consumer information, and use it in new and harmful ways. Okay. Kind of leads us into the intent of Congress. I guess the argument is Congress, 1934, intended to give this power to the FCC. Well, even if that were true in 2017, they took this power away, did they not, by the disapproval resolution? And tell me, give me your best argument as to why this rule has not been knocked out by the CAR application. Well, Judge Griffith, I think you recognized at the beginning of the talking about this issue, that this is a difficult issue and it can affect a lot of different agencies. So I do think the court should be cautious in proceeding, in interpreting. We're always cautious. But I think it should be especially cautious in that an overly broad interpretation of the scope of the reissuance bar. I'm also, you know, recognize that I think if we accepted your interpretation, that when rules are rejected in a package, that the administrative agency can get around the intent of Congress by re-promulgating the rules separately. And that somehow gets around the disapproval. And I think if we were to accept that, the CAR Act would not mean anything at all, because the agencies are still able to get around the intent of Congress. So let me try to address your concerns in a few different ways. All right. First, I don't think you need to reach that issue. Well, that's one of your arguments, is it not? It is. You can promulgate these rules piecemeal and that's fine. So I think that there are several important limits on that. And I think the interpretation of the CRA in this case doesn't require reaching the question of whether an agency could simply reenact every piece, because that's really what's not. That's not what's going on here. We're talking about a very small piece of a much broader order. We're talking about an order that's focused almost primarily, almost exclusively, on broadband internet service providers, and which this particular breach notification rule does not apply to at all. This rule was included with the broadband rule, was it not? I really don't... I don't think you conceded that. I don't think it was. I think there are meaningful differences. I think if you talk about it at a high enough level of generality, breach notification rules that implicate... Okay, a lot of this rule was previously in the broadband rule that was rejected, right? I think if the question is, was a breach notification rule that covered personally identifiable information, was that included within the previous rule? At that level of generality, yes. But I do think that there are very meaningful differences. Tell me how the 2024 rule is not substantially similar to the 2026 rule that was disapproved by Congress. Sure. I'm happy to address that question. I will clarify that substantially the same is the statutory language, not substantially similar. And I do think that's a meaningful difference. And the cases often use substantially identical, correct? The one court of appeals to look at the scope of the reissuance bar, the Ninth Circuit case, Safari International, used the phrase substantively identical. And I think that's the best reading of substantially the same. But really, the key differences are in the most important definitional terms in the statute. We can point to a lot of differences about what's included this time that wasn't included before. I think if you want to cut to the heart of the matter, in the SEC case that petitioners cite, to provide an example of what is an okay way to reissue a rule, they point to key definitional differences that they say changed a rule enough to make reissuance okay. And here, what you have is you have a very significant difference in the definition of the term breach and also in the definition of the covered information, personally identifiable information. Doesn't mean the same thing in the 2024 rule versus the 2016 rule. So, with respect to the definition of breach...  All right. The personal information, what are the differences there? Sure. So, the commission narrowed the definition in a couple key ways. It said that individual pieces of information that were covered by the rule had to be able to be combined with others to create a risk of harm to the consumer. So, it wouldn't be just enough to have an email address or an IP address accessed. It would have to be in combination with something like an email address and a password or a name and a social security number. And in combination, the information to be covered by this rule has to pose a real risk of harm to the consumer. And I think that also relates to some of the other exceptions here that really narrow the rule in significant ways, many of which were requested by the carriers. So, the good faith exception is not some, I think, marginal consideration. This really goes to some of the core of what the carriers felt was problems with the earlier 2016 rule, which is that the good faith exception completely removes from the definition of breach information acquired in good faith by carrier's employees and agents, which leads to no harm to consumers. I think that really does make a significant difference in the kind of information that's covered here. There's also other exceptions that have been added for things like encrypted data. If encrypted data is released and it's unable to be decrypted, then that's also not covered information. So, I think these really are significant differences. It's not simply, you know, sort of fiddling with 30 days or 31 days. These are really core differences. And they were adopted because the carriers urged us to take another look at some of these requirements and fine-tune the rule. I also think it helps to understand that, you know, Congress never really considered any of these issues when it disapproved the 2016 rule. I don't think it matters. I think if they have disapproval, it takes effect. You're out of time. I'll give you a minute if you want to sum up. Thank you, Your Honors. We would urge the court to deny the petition and steer a cautious course in preserving the authority that the commission needs to respond to new changes in threats to consumer privacy in the telecommunications space. I think that authority is well set out in the Communications Act and creates no necessary problems under the Congressional Review Act if you look at the most granular details of the rules that were passed. All right. Any further questions? Thank you. Thank you. Three minutes rebuttal. Thank you, Your Honors. I'd love to talk about 222-201. Judge Branch's question about the FCC's ability to evolve and then the CRA. With respect to 222, my friend on the other side talked about the regulatory history and sort of, you know, alluded to statements in prior rulings that allegedly support him, but there were no citations. There were no quotations. I would just urge the court to look at 2013 and 2007. The rules that we cited, I think, do very clearly lay out, also the 1998 order very clearly laid out the Commission's historical view that 222 is the full extent of their authority. With respect to the definition of proprietary, my friend on the other side said that the key limiting principle is that the PII needs to be obtained through the customer-carrier relationship. Even if that's right, I'm not sure that's right, but even if that's right, that's not part of their actual definition of PII. It's not part of their definition of breach. I don't think that's incorporated in their rule. If that's what proprietary means, then the rule exceeds their authority, even by that concession. I think with respect to whether section 222A has independent meaning and how to think about the exceptions, my friend on the other side says, and I'm quoting here, it doesn't make sense to say that the exceptions apply to 222A. But if you look at their brief on page 43, they say, This does not mean that the same exceptions cannot apply to carriers' obligations under 222A. They repeat the same statement on 44. So in their brief, they had to rewrite the rule. We're backpedaling here at our argument. I think what this shows is that their interpretation of section 222 just doesn't hold up. With respect to section 201, what they're trying to do is turn section 201B into a sort of mini version of section 5 of the FTC Act. And there is one similarity. It's maybe the adjectives are similar, but they ignore the differences in the heading, the differences in the nouns, the differences in the prepositional phrase, the differences in the historical purpose and historical understanding of these provisions. The FTC Act also has a definition of what's unjust or unfair in section 5N. It obviously doesn't apply here. Yes, it's true. Congress wanted to confer authority in 201B, but it's not the same sort of broad authority that the FTC has under section 5. Judge Stranst, you asked about the ability of the regulation to keep up with evolving developments. We agree with that. And we think, number one, Congress has been the one to act here. Congress has taken into account the changing landscape with respect to privacy and PII and CP&I. It enacted section 551 and section 338 addressing PII in the Communications Act. It also addressed CP&I in 1996 when it enacted section 222. There are lots of legislative proposals that are impending in front of Congress that address these issues. Congress can act here. The FCC does have power, but it doesn't have a blank check. 201B is not a blank check. And then finally, when the Congressional Review Act authorities are exercised by Congress, Congress is sending a very clear signal that the FCC no longer has the ability to act. Finally, with respect to the CRA itself, I think the core issue here is who controls the scope of the reissuance bar. Is it Congress or is it the agency? We would just submit it cannot be the agency. The agency cannot have the ability to essentially turn off the reissuance bar by just splitting a rule into two parts and repassing it or by adding some small provision to the rule and saying it's not substantial. The argument is that there are more than just small provisions. There are major changes in the 2014 rule than from the 2016 rule. Can you address that? Yeah, I don't think that's right. I think if you want an objective take on what the 2024 rule is intended to accomplish, again, we'd point you to page A96 of the record here and look at Chair Worsel's statements. And she did not emphasize the relatively ancillary and minor points that my friend on the other side emphasized. Instead, the way she described the fundamental changes that were the fundamental things that the 2024 ruling very similar to what we highlight on the chart on page 44 of our brief. And in particular, it's the change from CP&I to PEII. It's the expansion of the disclosure requirements to cover inadvertent breaches. It's the expansion of the reporting requirement to cover the FCC. It's the creation of a 30-day deadline. And it's the creation of a harm-based trigger. So those are the fundamental elements that Chairman Worsel thought were so important. And we think those are the key elements. And these are substantially the same. Any further questions, Judge Smith? Briefly, going back to 201B for just a second, how does global telecommunications impact the way that we construe practices? I understand you talk about panties and prepositional phrases, all of that. But how does that impact how we construe 201B? You mean the case? I'm sorry. So how does what? Global telecommunications. The case, the Global Crossing case? Yes. Oh, OK. So I think in that case, the Supreme Court upheld the agency's authority. But it did so under Chevron deference. So the court said, we don't really have to figure this out for ourselves, because the agency has Chevron deference. That was the key theme throughout the opinion. There's no more Chevron deference. So you can't defer to the agency. But even in that case, the agency was construing the term practice in a way that was clearly tied to the issue. The thing that was at issue there was clearly tied to the provision of telecommunication service. Here, it's far removed. It's highly attenuated. We're not talking about anything having to do with the provision of telecom services. We're not even talking about privacy. We're talking about the disclosure obligations that someone has after there's a data breach. That's far afield from the historic understanding of 201B. And so there's nothing in that case that supports them. If anything, the Global Crossing case says that the historical understanding of Section 201B is narrow. It's not the broad authority that my friend on the other side said. It's narrow, and it's confined to things like setting rates and whatnot. OK, any further questions? All right. Thank you, Mr. Martinez. Thank you for your arguments. The case will be submitted.